Good morning. The first matter we have listed for this morning is United States of America v. Chaka Fattah Jr. In this oral argument, we have divided the time according to the appellant's side. We have the somewhat unusual situation of the appellant appearing pro se, but the court has also appointed amicus in the person of Ms. Brotman. We will divide the time, therefore, between Mr. Fattah and Ms. Brotman according to five minutes. And Ms. Brotman, the remaining ten minutes, Ms. Brotman, we will also accord you the opportunity if you wish to provide rebuttal in the matter. So with that said, Mr. Fattah, you may proceed, sir. Thank you. Good morning, Your Honors. May it please the Court, my name is Chaka Fattah Jr., and I am the appellant in this matter. On February 29, 2012, a news story was released by the Philadelphia Enquirer entitled, FBI Seizes Records of Representative Fattah's Son. Mr. Fattah, and I say this for your benefit, not wishing to interrupt you, but we want to make sure you make the best use of the time accorded to you, and I can assure you that the panel has read the facts, and we know the facts in the procedural aspects of this case. So it's probably best to address ourselves to the legal issues that have been raised by you and that have been raised by Ms. Brotman as well. Let me ask you about your claim under the Sixth Amendment. Yes. Because it is based, as I understand it, upon your loss of income and the causative factor that that loss creates in your alleged inability to obtain counsel of your own choosing. Is that correct? Yes, that is correct, Your Honor. Well, first of all, in terms of the record that exists that we now have, what did you show before the district court relative to, number one, the loss of income and how that came about, and number two, how that affected directly your ability to obtain counsel? Thank you, Your Honor. Before the district court, in my pretrial motion to dismiss, I stated specifically that I had a business, my consulting business, and I had a business that in 2010 brought in $160,000 in profits, which income flows through to me as the sole owner. I stated that the consulting business brought in approximately $170,000 in profits in 2011, and I stated specifically that I lost substantial income and was unable to earn any money going forward after the date of the news story. With the reply brief, I submitted an affidavit saying, I'm paraphrasing, that I was able and willing to testify to these matters, and I requested an evidentiary hearing. The government opposed that evidentiary hearing in the district court. Is that the second motion, the motion that was addressed during the course of trial? It's not restyled as a motion for hearings, I recall. I just want to be clear, Your Honor. I'm referencing the first motion, which was filed on December 10th. It's District Entry 34. I can tell you that I filed a motion. I requested an evidentiary hearing. That was your motion to dismiss the indictment, wasn't it? Yes, it is, Your Honor. January 22 of 15. That's the ruling. The ruling came out on January 22. That's right. I'm sorry. I just want to be clear. On December 10th of 2014, I filed a motion. It includes a number of facts that are alleged by me in that motion, and I'm also requesting an evidentiary hearing. The government, as I stated in both my opening and reply briefs, opposed that evidentiary hearing. So I stated as clear as I could that I had a business, I was earning money, and subsequent to this story, I didn't earn any money. My argument was based on the United States v. Stein from the Second Circuit, where they held, in 2008, in a unanimous panel opinion written by then Chief Judge Dennis Jacobs, that that money that the defendants had not yet received, that in that particular case was a benefit of their employment. Don't you think that your case is significantly different from Stein in that the facts in Stein involve an agent of the government going directly to, I believe it was KPMG, wasn't it? It was KPMG, Your Honor. So there was effectively pressure exerted by a government agent directly upon KPMG not to provide that benefit. There was pressure exerted, but the only person... It would be like the government going to Delaware Valley High School saying, don't pay him anymore, right? Right, and what I'm saying is... Doesn't the record show that you had gone and severed that relationship? No, the record does not show that, Your Honor. I want to be clear. But there is a recording in the conversation that says that you had intended to strike that on your own anyway. I just want to be clear, Your Honor. The recording was taken after I was already fired, after my contract was terminated. But I said in that recording, the quote in the government's brief is, when this all comes out, I'm referring to... I was arguing to the school district that there may have been a breach of contract regarding a contractual relationship between Delaware Valley High School and the Philippines School District. What I was talking to them about was an anonymous... I made an anonymous claim to the school district. What I said is that if they were to take action against the school district based on that claim, that I would no longer work there because it would be obvious that I gave them the information. It says, when this all comes out, I'm basically resigned. And that was already after I was fired. There's also evidence in the record that you had engaged a consultant, you had started working up a plan for a business in direct competition, and that suggests that you had already made plans to terminate that employment. Isn't the prospect of future employment itself too speculative to give us the causal links needed to make this case akin to sign? Well, Your Honor, I think that what the government has done, and I want to have an opportunity to directly address this issue about this business plan, but what the government has done is they've pulled random references from the record, such as this business plan, and tried to suggest that that means that automatically I was going to leave my job. I had an apartment that cost several thousand dollars a month. I had perfect credit. There's nothing in the record that suggests that I would ever walk away from my job without a specific opportunity. I was looking at the possibility of opening a competitor. In so doing, I obtained legal advice, and I was continuing to do my job every single day between 9 and 5, and I had not given any notice to my employer, Delaware Valley High School. My plan was to raise funds, and in the event that those funds were raised, I was going to leave and compete with Delaware Valley High School. And I've been working for them for nearly three years, Your Honor. I'm sorry. All right. Mr. Patak, because we're already over the time, a lot of you, let me give you an opportunity to briefly address the matter that you just indicated you wanted, the business plan, I think, that you wanted to speak to. Can you briefly address that, and then we'll move on? Yes. I mean, it's a draft business plan. I mean, I don't think that there's anything wrong with thinking about the possibility of some other type of employment or some other type of business relationship. There is no dispute between the parties or in this record that as of the day of February 29, 2012, I was still a consultant working for Delaware Valley High School through a relationship with one of their related entities. This issue caused by the government in which an agent broke at least three federal laws created a situation where I could no longer do my job. My job, I was in charge of marketing. I went and made presentations to school districts in public. How did it accomplish that? How did it get that result? It accomplished that because within a few hours of the news story, I was over a phone call. I was fired. I was told my services were no longer needed. I was on my seventh contract in 32 months with Delaware Valley High School, and I was certainly thinking about the possibility of leaving, but I had not taken any concrete steps related to my contractual relationship. My plan was to raise money, and if I didn't raise that money, I would have stayed at Delaware Valley High School. Wouldn't those consequences have been inevitable once the search took place? When the search was done, this was a condominium. It's a fairly public location. You were a fairly public figure. Once the news came out, even if there had not been a prior disclosure, wouldn't it have had the same effects on your earning potential? Well, no, Your Honor, and let me just briefly explain why. Number one, I lived in a building of 270 units. It is a fairly public place, but the agents were in plain clothes, as the pictures that accompanied the original copies of the news story showed. They were in suits. They're just individuals in suits walking into the building. You don't think that there would be, as a matter of public knowledge, the execution of a search warrant at your residence through some other source or some other means? Well, I think that based on everything that I know about some other source, I guess it would be speculative, I believe, to think that, for instance, somebody would have said that. I suspect, given where your residence was, there are not a lot of search warrants executed there, at least not on a regular basis. To my knowledge, there are not a lot of search warrants, but I don't think anybody at the building knew what was going on. I can tell you, except for staff people who were shown a badge, and these individuals were led up to an elevator. Other than that, I can tell you that nothing, to my knowledge, nobody from the building made any phone calls to any media person. I mean, in terms of how this could have came out, these were individuals. The FBI agents were in plain cars, because there are pictures of their cars in some of the photos. They were in plain cars, and they were in plain clothing, Your Honor. My issue is that, essentially, the government has argued here that this is about the publication of a search warrant. That's not my argument. My argument is that this is about the publication of the details of a criminal investigation by the federal government. The search warrant is one part of the story, but what they talk about is the value of my contracts. That has nothing to do with the search warrant. They talk about the fact that the FBI has been investigating me for more than a year. That has nothing to do with the search warrant. They talk about my relationship with Delaware Valley High School, which, if Your Honors, the search warrant affidavit says really nothing about Delaware Valley High School. They're investigating taxes and bank charges, which are less than half the charges in this case. The search warrant affidavit says nothing about Delaware Valley High School and doesn't allege any violation of law related to it when you look at the attachment. All right. We've already gone well beyond twice the amount of time. I'll allot it to you. Thank you. Thank you, Your Honors. I appreciate that. We'll hear from Ms. Brockman. Good morning. Good morning. Thank you, Your Honors. I would like to reserve two minutes for rebuttal at this time. Great. Ms. Brockman, could you begin, please, by explaining your argument that a waiver against the government... Your... I do not think that the waiver argument that I presented is the strongest argument that I have. And... Neither do I. Right. So that's a starting point. And so... And I was not requested to brief that argument and may have briefed it in error. But I don't want to say anything as if... I've never been an appellant's amicus before. I've been an appellant and an amicus, but not an appellant's amicus. And so I don't want to say anything that opposes the appellant's point of view at this time. No. And also I would say that whether I'm right on waiver or not, certainly the court can look at the record and make its own determination about what's in the record. And so I would like to start with where Mr. Fattah left off on this issue of would this have happened anyway? Because that's definitely a question that I've struggled with myself. There's a public search warrant. But I think he actually has absolutely the correct analysis of this, which is that there's a difference between a news story about a search warrant. Or maybe there wouldn't have been a news story if the news hadn't been there. Maybe there would just be rumors coming out of the building, some stories. But not every person or every entity who is searched is also a grand jury target. And those are two very distinct categories. You're someone who has had a search executed, or you are a grand jury target, with all of the details that are in that newspaper report. So, you know, I think what the- Would you agree, though, that this case factually is almost likely to have some way of constying? It's hard to know, since we don't have a factual hearing. We don't have a hearing on this issue below. And so I think that, at the least, Mr. Fattah is entitled to a remand for a hearing on what is- what was his earning capacity before and after the news story. But just focusing on the legal theory itself, isn't the legal theory quite far from Stein? In the sense that there, as Chief Judge Smith was pointing out, there was a direct link of the actions of the government to the fees of defense counsel. And here we have this series of links, many of which are speculative, starting even with, would this have been made as public in any event? Maybe it would have, maybe it wouldn't have. Even if it wouldn't have, the argument seems to be that this would affect- it would affect his reputation and therefore had a subsequent effect on earning potential as to prospective employers, prospective income, ultimately resulting in his inability two years later, when the Sixth Amendment finally attaches, to have counsel of choice. That seems quite far in terms of the theory from Stein. Well, and I understand that there's certainly- it's a more attenuated situation than it is in Stein, where you actually have the government going to the- There's a much longer causative chain that would have to be proven here than what obtained in Stein. That's right. And the similarities between Stein and this case, I think, is that for one thing, they are both unique. These are both sort of one-off situations. You know, the- or at least we hope they are, in terms of- When you get these unusual government misconduct cases, they, by nature, will be idiosyncratic. Surely you're right about that. Right. But what about the causation issue? Well, and so, I- it's- the causation issue can be proven. There is a path to it, but what I believe is that there has to be a hearing to set the facts before the court. And so, you have- what you have is the illegal conduct of the agent. That's not in dispute. It's, you know, it's intentional. It's unnecessary. Before you said the word intentional, is there any kind of intent requirement in the jurisprudence that should be demonstrated here? I think the- in terms of the due process issue and the outrageous government conduct issue, I think that the- But not as to the Sixth Amendment issue, which is what we're talking about right now. Well, they're so interrelated, actually. I mean, in my mind, the due process violation is what causes the Sixth Amendment violation. And so, you know, just- and you can absolutely separate it out, but the due process violation has as its consequence this harm to reputation and inability to earn money. The same facts underline both constitutional violations and alleged constitutional violations. But a due process violation as a matter of law is not a predicate to the Sixth Amendment violation. No, it's not. It just arises out of the same core facts. It's not necessary for the agent to have intended to harm Mr. Fattah's reputation to the extent that he could not work and therefore could not have counsel. And so- So are we talking about something really in the nature of proximate cause? I think we are. I think we are. And you're saying a hearing would be necessary to determine that. Really, sitting here today, you're saying we can't figure it out. There needed to be a hearing. Yes, that is what I'm saying. But aren't we obliged to analyze what that hearing would look like based on the facts that were proffered at trial and pretrial? I think- I mean, we can't just assume that there would have been or might have been causation. But I don't- I understand what you're saying, Judge, but I don't think you can also assume that there wouldn't have been without the hearing. But a district judge isn't just going to grant an evidentiary hearing. There's going to have to be some kind of procedural threshold met by the effort before that evidentiary hearing is conducted. What's that threshold? I think the threshold is a showing of governmental conduct or governmental misconduct that contributes to a deprivation or causes a deprivation of counsel of choice. Wouldn't that pertain to every criminal case where there was some disclosure, some illicit disclosure or at least alleged to be improper on the part of the government? What distinguishes this case from any case where that disclosure has a negative effect on a defendant's reputation and, if we agreed with the theory you're espousing, would then lead to hearings and prospective Sixth Amendment violations any time there's an effect on a defendant's income? I don't think this is the- I see this as a very narrow case and a unique case and not as a case where there's a potential of a floodgate opening that every time there's a leak there's also a reputational damage that creates an inability to defend oneself. That actually doesn't happen in every case, even though we know that there's, as in many cases, still individuals are able to either obtain counsel in some other way. So I do think that we may be setting a precedent that when the government acts in a certain way and there are leaks of this magnitude and it's alleged to have a cause or create an inability for the defendant to have counsel, there may need to be a hearing. I will be interested to hear from the government as to whether this is a one-off or whether it might actually open the floodgates. I can conceive of situations where a law enforcement officer and or a prosecutor seek to exert pressure on someone to be charged and seek to have that person cooperate. And the cooperation is of sufficient intensity, shall we say, or creates scheduling obstacles such that the person's job is somehow affected. We want you to work this street with us every night for the next so many weeks. The person loses their job. Is that offensive government conduct? Law enforcement officers seek to get that kind of cooperation. I lost my job. I can't afford legal counsel. In that scenario, I think the person who's the cooperator is also agreeing, right, consenting. So what you're saying is there's undue pressure because of the coercion. That's an interesting hypothetical judgment. I would have to think about what motion I would make if I represented that person and he lost his job as a result of the cooperation and couldn't afford me. I'll be interested to hear from the government. Maybe there's some limiting principle here. Maybe it's not a huge problem. Maybe this is all about the facts necessary to muster in order to show the requisite causative chain. That seems here to be a formidable task. What proper of any kind was made by Mr. Patak at either juncture, either the initial motion to dismiss the indictment, which led to an order from the court which didn't reach that the Sixth Amendment issues, or the eventual, during trial, motion for a hearing? I've asked about this threshold. Whatever the law says it is, what was proper? Well, at the time of the original motion to quash, Mr. Patak included information about his earnings, his earnings ability, his business prospects, and alleged that these were cut off after the story. And the government denied that they had anything to do with the leak. And so that really cut off that line of inquiry, that discussion. But Mr. Patak did file in his response to the, in his reply to the government's response, he filed an affidavit saying, I can testify to all this and I can prove this. So, I mean, I think there's, you know, there's at least a fact finding that might have been done had the government said at that point, we're talking to the agent, and we believe that the agent, you know, and the agent has now admitted to us. Instead of on October 27th in December of 2014, if the agent had admitted, yes, actually, I met with the reporter and I gave her all this information. I did want to make one more point, and I know I'm running out of time. Before you leave at this topic, can you tell us as well, what, if anything, is in the record reflecting Mr. Patak's actual efforts to secure counsel? I mean, he's opted to proceed pro se. What is there that indicates that he was unable to secure counsel and made efforts to do so? You know, I don't recall seeing that in the record, Judge. And so that is something that would have been developed in a hearing. But he's, and I understand he opted to go pro se and, but in that- It wasn't a choice between pro se and counsel. It was choice, it was pro se and appointing counsel. Right. We get that. Why don't you make the additional point you want to make. The additional point I want to make is there are leaks and there are leaks. There are leaks which are, you know, if you come to the coroner's- We hear a lot about leaks. I'm sure you do. Yes. I'm trying not to talk about politics. Injecting it pretty much into everything I do lately, but I'm keeping it out here. But, you know, there are, you know, if you come to the coroner's at 6 o'clock at 10 o'clock tomorrow, you'll see something that will be worth writing about. And then there's what happened here, which is months of sharing of information. You know, the identity of the target. All of the facts that Mr. Fattah laid out, that is a very different thing. That is qualitatively different. And that's why I think it creates the outrageous governmental misconduct. All right. We'll have you back on rebuttal. Thank you. Thank you very much, Mr. Gibson. Good morning, Your Honor. May it please the Court. Let me say at the outset that the government doesn't minimize or condone the actions of the case agent in this regard. It shouldn't have happened. It was regrettable. It was inappropriate. But the question before the Court is whether that activity in and of itself, by itself, warrants the extraordinary dismissal of an indictment. And let me say, certainly, you made that same statement in your papers, and the panel appreciates it, I know. And as a longtime trial judge and an old state prosecutor, I can also say that the government certainly did the right thing when they found out the facts during the course of trial. Thank you. We're beyond that. Thank you. But as it relates to the arguments put forth both by Mr. Patah and Ms. Robin, what we're engaged here in is a search with a particularly moving target. At the pretrial phase, Mr. Patah, again, Mr. Patah was warned explicitly by Judge Barber about the dangers of proceeding pro se. But under this Court's precedent, he was granted that opportunity. He exercised his rights to litigate his case pro se. He identified the issue pretrial as some sort of outrageous government misconduct under the due process prong, suggesting that that was part of the dismissal of the indictment. But Judge Bartle didn't reach the Fifth or Sixth Amendment issues that first time around, did he? Judge, he rejected the outrageous government conduct because Mr. Patah had not proffered any specific facts alleging any grand jury material as he couched it at that time had been leaked. And, again, as we stand here today, there is no grand jury material that's been alleged that has been leaked. And, in fact, contrary to Ms. Robin's point a moment ago, when Agent Haig was cross-examined at length by Mr. Patah, Mr. Patah essentially went through the articles that were printed in the wake of the search line by line and established not a single fact that emerged from the grand jury investigation. So the government's position is the record demonstrates no Rule 6 violation. That's correct, and Judge Bartle so found. Now, also, Judge, Mr. Patah, to be sure, he did, in fact, make reference to Stein in his motion to Quash. He did go on at some length about the holding of Stein. But he proffered no facts of any kind to the court that would warrant further inquiry into that claim. So that gets me back to one of the questions that I asked Ms. Proffitt, which is, what is the threshold here? What should an applicant seeking dismissal of an indictment or seeking a hearing, as was done, each was done in this case, demonstrate to the district court? Well, Judge, I don't think it's dissimilar than alleging a Fourth Amendment violation on a search. So we should perhaps look to Rule 12b as an analog here for what ought to be shown before one is entitled to an evidentiary hearing. I would agree with that position, Your Honor. I think it's incumbent upon the individual seeking relief and seeking an evidentiary hearing that he identify what the specific issue is, that he identify the facts that give rise to what he is alleging resulted in the deprivation of his constitutional rights. But having failed that, like in a Fourth Amendment situation, if you don't allege appropriate facts warranting an evidentiary hearing, you're not in an evidentiary hearing. What about the timing issues? I understand their argument, suggestion is made that had the agent's misconduct been timely disclosed, they would have had an opportunity, either Mr. Fattah and or with the help of counsel, would have had an opportunity to marshal the facts necessary to make that choice. Well, Your Honor, I think that unfortunately for Mr. Fattah, for him to take that position today before the court runs headlong into the facts as they were established at trial,  but it has been clearly established that the defendant was seeking to remove DVHS as a competitor as he was starting his own firm to take DVHS. All right, why don't you give us the timeline on that, because there's a dispute between both sides on that. Well, Judge, I don't know that there is a factual dispute as to when he began the initial steps to form Dream Chasers. I don't recall that being contested at all during the trial. Is there really a factual dispute about whether Dream Chasers truly was in competition with Delaware Valley High School, and if so, at what time the competition began? And I think the timeline is as follows, Your Honor. In early 2012, he had reached out to the California company to establish or begin the business plan of Dream Chasers. He had already enlisted a fellow coworker at DVHS to join him on this Dream Chasers venture, and as that is percolating, he contacts the inspector general of the Philadelphia School District because there is a no-compete clause in his contract with DVHS. He is not going to be able to assume that role with Dream Chasers by pushing DVHS to the side unless DVHS is in fact destroyed. Well, Mr. Vitale's solution to that was to report on the fraud that he and Mr. Shulich had been engaged in together, shut that on to Mr. Shulich solely, have the school district sever ties with DVHS so he could step forward with Dream Chasers. As that is taking place, he's contacted the Philadelphia School District, the search warrants are executed. That's one source of income, but as he clarified in his argument, Mr. Vitale also had a consulting business, and in the affidavit that he put in in connection with the motion to quash made the allegations, since he didn't get a hearing, he wasn't in a position to prove up the facts, the allegations, that he lost that income from his consulting business and briefs, that he lost prospective contracts and the opportunity for other employment. Why aren't those allegations raised in his affidavit, raised in the briefing, enough to warrant an evidentiary hearing that he was denied in the district court? Judge, I also heard what Mr. Vitale said today, but again, I would submit to the court that that would run headlong into the facts that were established at trial. At the time frame that we're talking about here, 2012, the sole source of Mr. Vitale's income was his contractual relationship with DVHS and Mr. Shulich. There were no other clients. There was no other business. He called his firm 259 Strategies a consulting business, and that served Mr. Shulich's needs, because Mr. Shulich needed a minority business entity certified with the state in order to satisfy a contracting requirement with the Philadelphia School District. But there was not a scintilla of evidence in the record that in the time frame that we're talking about, Mr. Vitale earned income from anywhere else other than Mr. Shulich, and indeed the size of the income, he received 10% of the overall contract as the minority business entity with Mr. Shulich. That netted him approximately $490,000 per annum based on the contract, as I recall. Mr. Vitale at the time, being engaged in the fraudulent conduct with Mr. Shulich, wasn't particularly in need of other clients and wasn't looking to expand his business. There were certainly no attempts to prove that at the time of trial. And again, I think that the problem here is that the trial record would refuse any suggestion to the contrary. You've argued in your brief that there is no proof in the record that the government even considered, much less attempted, to undermine Vitale's selection of counsel. Which gets me back to one of the questions I asked Ms. Brodman, and that is, is there some element of intent that's required when we're looking to determine whether a Sixth Amendment violation of this type took place? As far as I'm aware, Your Honor, Stein stands by itself. And Stein, on the facts of that case, if one assumes that the Second Circuit decided it correctly, and I think that could be open to some discussion. But assuming they decided it correctly, their holding appears to be based on the intentional conduct of the government. In fact, in Stein, as I recall, they applied a nexus test that in the court's judgment, the relationship between the defendant's employers and the government was such that the government was essentially standing in the shoes of the employer and directing the employer, you will pay these fees, you won't pay these fees. You will continue allowing legal fees to be paid to the parties who are involved as long as they cooperate, or you won't. But the government was standing in the shoes of the accounting firm at the time, and that was, as I recall, both the District Court and the panel in the Court of Appeals based their decision on. So to the extent that Stein is proffered to this Court as controlling authority, suggesting that a Sixth Amendment violation on these circumstances could be found and Stein should be applied, I believe Stein does in fact require specific intent on the part of the government to interfere with the relationship of counsel and the defendant. And that is clearly absent here. There is nothing on the record. Why should intent be required? I can conceive of some scenarios where the government accidentally seizes the wrong bank account or seizes a priceless work of art. You could play out numerous scenarios where the government, through negligence or accident, deprives somebody of the funds necessary to retain counsel of choice. If the government doesn't return the assets to the agreed party, shouldn't that suffice to satisfy the Louise test? Well, Judge, I don't think that Louise is applicable here. I know it's different on these facts, but address that hypothetically. I'm trying to get at why intent would be the pulse for us. It seems to me the effect on the agreed party's ability to hire a lawyer would be the proper analysis. But putting aside the facts of Louise for a moment, as I understand Louise, and I think to a certain extent this would assist, Your Honor, in responding to that question, Louise is premised on the idea that untainted assets, untainted funds, should be available to a defendant. And the court, in reaching that conclusion, the Supreme Court said that courts at the trial level are routinely tasked. Due tracing all the time. Exactly. And so to the extent that, in Your Honor's hypothetical, there were some government conduct that mistakenly identified untainted funds as tainted, I think even Louise allows for the possibility of, as does Stein, putting the defendant back in the situation they would have been in but for the error. And Stein, they concluded that was not possible because of the stage they were at in the litigation. But again, Stein was premised on intentional misconduct. And there's simply no authority for the extraordinary remedy that Mr. Fattah is seeking here, the dismissal of an indictment. And to the extent that the outrageous government conduct doctrine has any applicability here, and I know the court is familiar with our position as it relates to that doctrine, but again, using that doctrine as a starting point, if the conduct in Nolan Cooper, which was intentional, the undercover agent engaged in sexual intercourse with the defendant, that was not in dispute. But if that type of intentional misconduct isn't enough to warrant the dismissal of an indictment, then I would submit to the court that the type of negligent conduct that the court has proffered as a hypothetical here certainly would not give rise to the extraordinary windfall the defendant would receive in that circumstance. The indictment here. Nolan Cooper would suggest, I think, that causation and prejudice is really the most important analysis, not intent of the government. Yes, sir. And as we stand here today. That gets us back to what impact did the government malfeasance have on Mr. Fattah's ability to hire counsel of choice? Well, and as we stand here today, none has been identified, Your Honor. In fact, the trial. And their response is, because we didn't get a hearing. All we wanted was a chance to. Judge, respectfully, I disagree with Mr. Fattah's position on that. He did not get a hearing pre-trial, obviously. The judge ruled on the plea. The trial was recessed mid-trial for Mr. Fattah to prepare his cross-examination of Agent Hay. Not only was he given that extra time to cross-examine Agent Hay, which he did at some length, covering all range of the agent's activities and the relationship with the press and so forth, but he abandoned his Sixth Amendment claim. When they filed their complaints mid-trial regarding Agent Hay's conduct following the disclosure, they were alleging, first, they wanted a contempt hearing for the agent. Judge Bartle had denied that. And second, they were alleging some sort of Brady violation. But he had yet another opportunity to put flesh on the bones of this argument that he wants to make now, having not made it previously by any means that would suggest the court would be justified in exploring it further. And I would submit to this court that the reason for that is because the trial record absolutely refutes the position that he's taking now. The reason he didn't proffer facts alleging that he was fired because of the leak to the newspaper was because it didn't happen then. Well, he had already gone some length to allege those facts in his affidavit. There was so much proceeding pro se, and this startling disclosure is made mid-trial. Is the government really going to argue waiver in the defendant failing to re-raise it in preparing overnight a motion to the court? Judge, if I could step back for a second on two points on that. The first is that Mr. Fatah, in attacking the disclosure or in preparing his attack on the disclosure, his standby counsel actually stepped forward on that and handled both the argument to the court and prepared a brief on Mr. Fatah's behalf in conjunction with Mr. Fatah as he was preparing his cross-examination of Agent Hay. But this goes back to also the fact of the matter is that Mr. Fatah elected to proceed pro se despite being warned of the dangers and chose to do it anyway. But that has consequences for how we approach our construction of his pleadings, and we do it in a liberal way. Indeed, Your Honor. But you can attach the most liberal construction conceivable to the affidavit that he claims to rely on now, that he attached to his reply brief regarding his motion to Quash that he filed pre-trial. There is not a fact in there that even remotely touches on this claim, as Mr. Fatah himself disclosed to the court when he addressed you earlier. The most that he said in that affidavit was, I will testify to any facts needed at any evidentiary hearing if granted. Judge, that is not enough. There is simply more required. The magic words due process do not in and of themselves give rise to an This is obviously a uniquely factual, fact-based question requiring a fact-based inquiry, the facts of which in this case would almost uniquely be in the position of the possession of Mr. Fatah, right? I would agree with that, Your Honor. I see it in my time, sir. Thank you very much, Mr. Gibson. Ms. Rotman will have you back, my buddy. Thank you. A few points. On the testimony of the agent on the 6E violation, the agent testified to several things that he told the reporter, including the identity of a target of the grand jury investigation. That's clearly a 6E violation. Mr. Fatah cross-examined him, and he and the agent conceded that he had provided all of this different information, including the contents of wiretaps. The district court made a finding that there was not a disclosure of any 6E information. That does not appear to be challenged on appeal. How are we in a position to reconsider that at this point? Actually, in my brief, I do raise the fact that that was an erroneous ruling. But I also think that that would be part of the fact-finding that would go back to the court. The other issue on the agent's testimony, the government says Mr. Fatah had an opportunity to develop all of this record during his cross-examination of the agent. That wasn't the opportunity for a hearing on these facts that he wanted. That was the continuation of the case agent's testimony. He was cross-examined on the search issues, but there was no development of a record. What you're arguing, as I understand it, is that at the very least, tactically, putting him in the position at trial to inquire into a matter that should have been addressed evidentially pre-trial puts him at a disadvantage. Well, how could he have asked the agent what the... As you said, Your Honor, these facts are particularly in the possession of Mr. Fatah. How could he have asked the agent to prove his claim that he had lost his ability to hire counsel? Well, proving it at trial is one thing, and submitting it in a written application is something else again, the latter of which was available to him at various junctions, right? Yes, but he attempted to do it, and I feel if the court had... It preserved the Sixth Amendment claim? Yes. It's in the motion to quash the indictment. He argues it for pages, and I think if the court had known at that time, if the district court had known at that time what it knew two and a half weeks into the trial, then there would have been a hearing. Ms. Brownman, can I just make sure I understand the nature of your Fifth Amendment claim? Because in view of pain, the limitation on due process requires us to find that there was some underlying violation of the defendant's rights. I had understood in your briefing that the violations to which you were pointing were the violation of a right to privacy, disclosure of tax information, and the reference that you alluded to earlier about grand jury material. I gather from your oral argument, though, that you're also contending that the subsequent Sixth Amendment violation could inform the violation of defendant's rights that Payne says is necessary to state a due process violation. Am I understanding your argument correctly? Yes. I believe those two issues are... I believe the due process violation stands on its own and also is connected and causes the Sixth Amendment violation. And I also, just to address Nolan Cooper for one minute... The way you frame that troubles me. In fact, it seems to make your burden more difficult. That you have to prove a Fifth Amendment due process violation first in order to move on to a Sixth Amendment violation? No, that's not what I meant. Because earlier I inquired, aren't you just saying they both arise out of the same four facts? Right. Yes. Did I not answer your question then, Judge Kress? I think you did. As to the violation of defendant's rights that would be needed to establish a due process violation, you include the Sixth Amendment violation along with the other statutory violations and rule-based violations to which you point. Yes. And on the issue of the outrageous government misconduct, which I agree is a very narrow doctrine. And when you look at the cases... And not terribly vital. That's right. But when you look at the cases and you say, oh, if this conduct is okay, then it cannot be that what we have here is not... But the distinction really is that all of the conduct that occurs in the government misconduct cases, even Barbosa and the ones that are cited in the government's brief, occur in the context of necessary or at least investigative techniques that serve a law enforcement purpose. And are legal. It's not illegal. Even what happened to Nolan Cooper, not illegal. And this is different. Because this is illegal conduct. Thank you very much, Ms. Brotman, for your argument and also for your contribution to the amicus at the council. Mr. Governor, thank you, Mr. Patan. We will, at this point, take time to get out.